# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| A.R.M.R., on her own behalf and on behalf of her minor child, A.P.D.M., ) ) ) | |
| Plaintiff, ) ) | Case No. 24-cv-2416-DWD |
| vs. ) ) | |
| UNITED STATES OF AMERICA, ) ) | |
| Defendant. | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Plaintiff A.R.M.R. filed a complaint on behalf of herself and her minor child, A.P.D.M., against the United States, seeking compensation under the Federal Tort Claims Act ("FTCA"). Plaintiffs allege they suffered harm when United States Customs and Border Protection ("CBP") agents detained and expelled them from the Country under the authority of an order promulgated by the Centers for Disease Control and Prevention ("CDC") during the COVID-19 pandemic which suspended the introduction of certain noncitizens into the United States on public health grounds.

The United States has filed a Motion to Dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Doc. 17). Among other things, the United States argues Plaintiffs' claims arise out of actions from which the United States is immune from suit under 28 U.S.C. § 2680. Plaintiffs have filed a Response (Doc. 26), and the United

States has filed a Reply (Doc. 28). For the reasons that follow, the Motion to Dismiss is **GRANTED**.

## I.    PRELIMINARY MATTER – MOTION TO PROCEED UNDER PSEUDONYM

A.R.M.R. is seeking asylum in the United States based on fear that she and her family will be persecuted or tortured if they are deported. Plaintiff contends that disclosure of her identity may place her and her family in danger from the individuals the family is fleeing from. Accordingly, A.R.M.R. has filed a motion seeking leave to proceed under a pseudonym. (Docs. 5 and 6). A.R.M.R. further contends that her request to proceed anonymously should be granted to protect her private mental and physical health information. The United States is not opposed to the request. (Doc. 21).

The Federal Rules of Civil Procedure require that all parties to a lawsuit be named. *See* Fed. R. Civ. P. 10(a) (providing that the "title of the complaint must name all the parties"); Fed. R. Civ. P. 17(a)(1) (requiring that an action "be prosecuted in the name of the real party in interest"). A court may permit a party to use a pseudonym in extraordinary circumstances only—when the party demonstrates that his interests outweigh both prejudice to the opposing party if anonymity were permitted and "the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *See Doe v. Village of Deerfield,* 819 F.3d 372, 377 (7th Cir. 2016).

Here, although A.R.M.R.'s desire to safeguard her private health information alone is insufficient to justify anonymity, her allegations of fleeing persecution and torture, coupled with the fear of violence if her identity is revealed, constitute compelling

grounds for proceeding under a pseudonym. *See P.A.-V. v. Bondi*, 148 F.4th 511, 515, n.1 (7th Cir. 2025) (fear of retaliation endangering petitioner and family warrants anonymity); *Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004) (danger of retaliation is a compelling basis); *Doe v. Gonzales*, 484 F.3d 445, 446 (7th Cir. 2007) (fear of home-country retaliation sufficient). Further, as in *P.A.-V.*, the potential harm from disclosure outweighs any potential harm of concealing A.R.M.R.'s identity. *P.A.-V.*, 148 F.4th at 515 n.1. Accordingly, the Motion to Proceed Under a Pseudonym (Doc. 6) is **GRANTED**.

## II. BACKGROUND

### A. Interim Final Rule

On March 24, 2020, in response to the emerging COVID-19 pandemic, the U.S. Department of Health and Human Services (HHS) issued an Interim Final Rule under § 265 of the Public Health Services Act. Interim Final Rule, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16559-01, 2020 WL 1330968, (March 24, 2020) ("Interim Final Rule"). The Interim Final Rule set forth a regulatory framework through which the CDC could issue orders "suspend[ing] the introduction of persons from designated countries or places, if required, in the interest of public health." *Id.* The Interim Rule defined the "introduction into the United States of persons from a foreign country" as "the movement of a person from a foreign country ... so as to bring the person into contact with persons in the United States ... in a manner that the [CDC] Director determines to present a risk of transmission of a communicable disease." *Id.* at 16,566. This definition included "those who have

physically crossed a border of the United States and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease." *Id*. at 16,563.

Comments to the Interim Rule expressly noted that although then-existing regulations allowed the "CDC to quarantine or isolate persons entering the United States," they did not "address the suspension of the introduction of persons entering into the United States under section 362." The comments went on to explain that, given concerns about COVID-19, protecting the public health may require suspension of the introduction of persons into the United States. Accordingly, the commentary explained, the CDC found it was necessary to promulgate regulations implementing § 265 of the Public Health Service Act. *Id.*

### B. March 2020 Order

Under the authority of the Interim Final Rule, the CDC issued an order requiring "a temporary suspension of the introduction of covered aliens into the United States" for a designated period of time. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060-02, 17061, 2020 WL 1445906 (March 26, 2020) ("March 2020 Order"). The term "covered aliens" was defined to include those "traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land [Port of Entry] or Border Patrol station at or near the United States border with Canada or Mexico, subject to exceptions." *Id*. at 17061. The March 2020 Order did not apply to:

> U.S. citizens, lawful permanent residents, and their spouses and children; members of the armed forces of the United States, and associated personnel, and their spouses and children; persons from foreign countries who hold valid travel documents and arrive at a POE; or persons from foreign countries in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE.

*Id.* Additionally, the Order included a humanitarian exception for "persons whom customs officers of DHS determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." *Id.*

The March 2020 Order mandated "the movement of all such aliens to the country from which they entered the United States, or their country of origin, or another location as practicable, as rapidly as possible, with as little time spent in congregate settings as practicable under the circumstances." *Id.* Its objective was to minimize the "serious danger [to the public health] of the introduction of COVID-19 into the land [Ports of Entry] and Border Patrol stations . . . and the interior of the country as a whole" from aliens "who would otherwise be introduced into a congregate setting" for immigration processing. *Id.* at 17061. *See also* 85 FR at 17067 ("The faster a covered alien is returned . . . the lower the risk the alien poses of introducing, transmitting, or spreading COVID-19").[1]

---

[1] In September 2020, the CDC issued a final rule implementing § 265. Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56,424 (Sept. 11, 2020) (codified at 42 C.F.R. § 71.40). On October 16, 2020, the CDC published a revised order pursuant to the Final Rule that replaced the March 2020 Order. 85 FR 65,806-01, 85 FR 65,806-01, 65,808 (Oct. 16, 2020) ("Title 42 Order"). Plaintiffs were detained by CBP agents on March 30, 2020 and were expelled from the United States to Mexico on April 6, 2020. As such, the Final Order, issued in September 2020, and the Title 42 Order, issued in October 2020, are not applicable to Plaintiffs' claims. Instead, the CDC order applicable to Plaintiffs' claims is the March 2020 Order.

## C. Operational Plan for Implementing the March 2020 Order[2]

The March 2020 Order charged the Department of Homeland Security ("DHS") and CBP with implementing its provisions. 85 FR 17060-02, 17067. To that end, CBP developed an operational plan to implement the March 2020 Order. *Id.* (stating that "CBP [had already] developed an operational plan for implementing the order.").

CBP's operational plan was issued in a memorandum on April 2, 2020 ("CAPIO-1 Memo"). (*See* Exhibit 1 COVID-19 CAPIO-1 Memo).[3] The CAPIO-1 Memo provided that "Injured Alien[s]" are not amenable to being expelled. (Exhibit 1, pg. 3).[4] Additionally, it provided the following guidance as to Convention Against Torture claims:

Aliens that make an affirmative, spontaneous and reasonably believable claim that they fear being tortured in the country they are being sent back

---

[2] The Court may consider the CAPIO Memo because the Plaintiffs reference it in their Complaint (Doc. 1 ¶ 22 n. 12), and it is central to their claims. *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018).

[3] Plaintiffs' Complaint references guidance issued by CBP in March 2020 and provides a link to what is purportedly the March 2020 CAPIO Memo. (Doc. 1, ¶ 22 and n. 12) (citing https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/COVID%2019%20Capio.pdf). Although the linked memo undated, filings in other district courts indicate it is identical to the CAPIO issued in conjunction with the March 2020 Order. *See*, e.g., *Huisha-Huisha v. Mayorkas*, No. 21-cv-100-EGS (D.D.C.), Doc. Nos. 57, 57-4, 57-5 at 15; *P.J.E.S. v. Wolf*, No. 20-cv-2245-EGS (D.D.C.), Doc. No. 15-1 (attaching CAPIO issued with March 2020 Order); *Martinez v. United States*, No. 2:24-cv-414-JKW-LRL (E.D. Va.), Doc. Nos. 6 and 6-1 (indicating that the CAPIO attached at Doc. 6-1 is the CAPIO issued in conjunction with the March 2020 Order). Other courts acknowledge a second, revised CAPIO issued in May 2020. *See*, e.g., *M.M.B.B. v. United States*, No. 1:24-cv-5031-TWT (N.D. Ga.), Doc. No. 20 at 5–7 & Exs. 20-2, 20-3; *Martinez v. United States*, No. 2:24-cv-414-JKW-LRL (E.D. Va.), Doc. No. 6 at 5–6 (stating that the version attached to the complaint is the earlier CAPIO and that Doc. No. 6-3 is the revised May 2020 CAPIO which was issued to "support" the May 2020 Concept of Operations Plan found at Doc. No. 6-4). The parties also reference the CAPIO issued in May 2020, directing the Court to Doc. No. 6-3 in the *Martinez* case. (Doc. 17, pg. 3 and Doc. 26, pg. 18). Given when Plaintiffs' claims arose, the CAPIO linked in Plaintiffs' Complaint, rather than the revised CAPIO at Doc. No. 6-3 in *Martinez*, is the version in effect at the time of the alleged conduct. Plaintiffs cite language from the revised CAPIO to support their discretionary function argument, but that language does not appear in the earlier version applicable to Plaintiffs' claims and linked in the Complaint. The Court attaches both versions as exhibits to this Order. For clarity, Exhibit 1 (CAPIO-1 Memo) is the version linked in the Complaint and the version issued in conjunction with the March 2020 Order, and Exhibit 2 (CAPIO-2 Memo) is the revised version issued in May 2020.

[4] CAPIO-2 Memo provided that an "Injured Alien" is a subject "that may be excepted from" the Order. (Exhibit 2, pg. 2).

to, will be taken to the designated station and referred to USCIS. **Agents should seek Supervisory Guidance**.

(Exhibit 1, pg. 4) (emphasis supplied).[5] In determining whether individuals were subject to the Order, agents were instructed to make decisions "[b]ased on training, experience, physical observation, technology, questioning and other considerations..." (Exhibit 1, pg. 1).[6] If an agent determined it was "more likely than not" that an individual was a covered alien, that individual was to be "transported to the nearest [Port of Entry] and immediately returned to Mexico or Canada depending on their point of transit." (*Id.* at 1, 3). The CAPIO-1 Memo, did not provide instructions on medical screenings or procedures for determining whether an Alien may have COVID-19, for determining whether a Convention Against Torture claim was "reasonably believable," or for determining whether an individual was "injured."

A revised CAPIO was issued in May 2020 (CAPIO-2 Memo). (*See* Exhibit 2 COVID-19 CAPIO-2 Memo). As is relevant here, the CAPIO-2 Memo additionally instructed as follows:

> [T]he order does not apply to persons who Border Patrol agents determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS will consult with CDC concerning how these types of case-

---

[5] The CAPIO-2 Memo provided as follows:

> Aliens who affirmatively and plausibly claim a reasonable fear of torture in the country to which they will be sent will be segregated and referred to U.S. Citizenship and Immigration Services for assessment.
> **Agents should seek Supervisory Guidance**.

(Exhibit 2, pg. 2).

[6] The CAPIO-2 Memo provided the same. (Exhibit 2, pg. 1).

by-case, individualized exceptions will be made to help ensure consistency with current CDC guidance and public health assessments.

(Exhibit 2, pg. 1). Although this language was not included in the CAPIO-1 Memo, virtually identical language was included in the March 2020 Order. 85 FR 17060-02, 17061. Like its predecessor, the CAPIO-2 Memo did not provide instructions on medical screenings or procedures for determining whether an Alien may have COVID-19, for determining whether an individual had "affirmatively and plausibly" asserted "a reasonable fear of torture"[7], or for determining whether an individual was "injured."

### D. Plaintiffs' Expulsion from the United States

On March 30, 2020, Plaintiff A.R.M.R., a Honduran national, entered the United States near Hidalgo, Texas. (Doc. 1, pgs. 3, 8). A.R.M.R., who was pregnant, was accompanied by F.J.D.L. and their then-three-year-old son. (Doc. 1, pg. 8). The family was fleeing persecution in Honduras and intended to seek asylum in the United States. (Doc. 1, pgs. 8-9). Upon entry to the United States, Plaintiff contacted CBP agents. After being examined by emergency medical staff, Plaintiff and her son were transported to a detention center. (Doc. 1, pg. 9). One day later, Plaintiff was admitted to the hospital in McAllen, Texas where she gave birth to her daughter, A.P.D.M. (Doc. 1, pg. 9).

On April 2, 2020, A.R.M.R. was discharged from the hospital with A.P.D.M. and transported to the detention center holding her partner and son. (Doc. 1, pg. 10). After four days in CBP custody, during which time the family stated their fear of persecution

---

[7] The CAPIO-1 Memo referenced an "affirmative, spontaneous and reasonably believable claim…" (Exhibit 1, pg. 4). The CAPIO-2 Memo references individuals who "affirmatively and plausibly claim a reasonable fear of torture…" (Exhibit 2, pg. 3).

or torture in Honduras, CBP agents told the family that they were being expelled to Reynosa, Mexico due to COVID-19. (*Id.*). A.R.M.R. and her partner protested their family's expulsion. (*Id.*).

A.R.M.R. and F.J.D.L. asked CBP agents how to register A.P.D.M. as a United States Citizen. (Doc. 1, pg. 11). CBP agents falsely told them that A.P.D.M. was not able to register for citizenship at that time, that she could not return to the United States until she was 18 years old, and that only A.P.D.M., not her parents, could register her citizenship. (*Id.*).

The family was expelled to Mexico on April 6, 2020. (Doc. 1, pg. 11). The family only had the clothes they were wearing and a few diapers and baby wipes. (*Id.*). CBP agents did not provide them with a cell phone, money, or food. (*Id.*). Additionally, CBP agents did not provide any documentary evidence of the expulsion, did not provide A.P.D.M.'s birth certificate, and did not return A.R.M.R.'s identity card. (Doc. 1, pg. 12).

A.R.M.R. and her family did not know anyone in Mexico. (Doc. 1, pg. 12). They were assisted by a "generous woman" who allowed the family to live with her for approximately one month. (*Id.*). Thereafter, they received assistance from charities. (Doc. 1, pg. 13). Because the family did not have money and A.R.M.R. did not have an identity card, A.R.M.R. was unable to receive post-natal medical care. (*Id.*). In March 2021, the family submitted a parole request under *Huisha-Huisha v. Mayorkas*, No. 21-100 (EGS), 2021 WL 4206688 (D.D.C. Sept. 16, 2021). On March 30, 2021, the request was granted and DHS paroled A.R.M.R. and her family into the United States. (*Id.*).

### III.     CAUSES OF ACTION AND MOTION TO DISMISS

Plaintiffs bring this action against the United States under the FTCA, 28 U.S.C. §§ 1346, 2671-2680, and assert the following claims: (1) false imprisonment for confining A.P.D.M. following her birth and continuing through her physical expulsion to Mexico; (2) false imprisonment for depriving A.R.M.R. of her liberty by expelling her from the United States to Mexico when she was medically compromised, tested negative for COVID-19, and feared physical injury, torture, or death if expelled to Honduras; (3) expelling A.R.M.R. without first seeking USCIS review of A.R.M.R.'s fear claims; (4) expelling Plaintiffs to a location or into conditions that placed their health and safety at risk; (5) failure to return A.R.M.R.'s belongings; (6) failing to provide Plaintiffs with information about obtaining a U.S. birth certificate for A.P.D.M.; and (7) intentional infliction of emotional distress.

The United States asserts that Plaintiffs' claims arise out of actions from which the United States is immune from suit under 28 U.S.C. § 2680. Specifically, the United States contends that the quarantine exception to the FTCA, 28 U.S.C. § 2680(f), bars Counts I-VII; the foreign country exception to the FTCA, 28 U.S.C. § 2680(k), bars Counts I,II,IV, and VII; the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), bars Count II; the detention of goods exception to the FTCA, 28 U.S.C. § 2680(c), bars Count V; and the misrepresentation or deceit exception to the FTCA, 28 U.S.C. § 2680(h), bars Count VII. (Doc. 26, pg. 7-17). Additionally, the United States contends that Counts I and II fail to state claims for false imprisonment under Texas law; Count III fails to state a claim for

violating Title 42; and Counts III and IV are not viable because they are premised on alleged violations of federal law. (Doc. 26, pgs. 17-18).

## IV.   APPLICABLE STANDARD

### A. Rule 12(b)(6)

To survive dismissal pursuant to Rule 12(b)(6), the complaint must contain a short and plain statement of the plaintiff's claim sufficient to plausibly demonstrate entitlement to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On review of a Rule 12(b)(6) motion, the Court construes the complaint in the light most favorable to the plaintiff. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). This means the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences from those facts in favor of the plaintiff. *Id.* Allegations that are, in reality, legal conclusions are not taken as true and cannot survive a Rule 12(b)(6) challenge. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012).

### B. Affirmative Defenses

Plaintiffs are not required to plead around affirmative defenses. However, an affirmative defense may be the basis for a Rule 12(b)(6) dismissal if "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (citing *United States v. Lewis*, 411 F.3d 838, 842 (7th

Cir. 2005)). In the Seventh Circuit, the exceptions contained in 28 U.S.C. § 2680 are considered affirmative defenses that the United States must assert and prove.[8]   *See McCoy v. United States*, 731 F. App'x 524, 526 (7th Cir. 2018) (discretionary function exception is a "defense to liability, not a jurisdictional bar[.]"); *Williams v. Fleming*, 597 F.3d 820, 824 (7th Cir. 2010) ("[T]he proper inquiry is not one of jurisdiction, but whether the United States has a defense to suit.') *abrogated on other grounds by Simmons v. Himmelreich*, 578 U.S. 621 (2016); *Parrott v. United States*, 536 F.3d 629, 634−35 (7th Cir. 2008) ("The statutory exceptions enumerated in § 2680(a)-(n) to the United States's waiver of sovereign immunity  (found in § 1346(b)) limit the breadth of the Government's waiver of sovereign immunity, but they do not accomplish this task by withdrawing subject-matter jurisdiction from the federal courts.").

With respect to these affirmative defenses, the Seventh Circuit has instructed courts to "scrutinize the cause of action" and, if a § 2680 exception is applicable, "relieve the United States from the burden of defending against a lawsuit." *Williams v. Fleming*, 597 F.3d 820, 824 (7th Cir. 2010), abrogated on other grounds by *Simmons v. Himmel*reich, 578 U.S. 621 (2016). This comports with the notion that immunity questions should be resolved at the earliest opportunity because " '[t]he entitlement is an *immunity from suit* rather than a mere defense to liability[.]' " *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

---

[8] Other circuits treat the § 2680 exceptions as jurisdictional limitations. *See, e.g., Seaside Farm, Inc. v. United States*, 842 F.3d 853, 858 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 2307 (2017); *Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012); *Loughlin v. United States*, 393 F.3d 155, 162 (D.C. Cir. 2004).

## V.    Relevant Statutory Schemes

### A. The Federal Tort Claims Act

The FTCA, enacted in 1946 and codified in multiple sections of Title 28 of the United States Code, "waive[s] the sovereign immunity of the United States for certain torts committed by federal employees" acting within the scope of their employment. *FDIC v. Meyer*, 510 U.S. 471, 475–476 (1994). Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *see* 28 U.S.C. § 1346(b) (providing exclusive jurisdiction to federal district courts over negligence claims against federal employees "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.").

There are, however, many exceptions to the waiver of sovereign immunity under the FTCA. 28 U.S.C. § 2680 (a-n). "The § 2680 exceptions are designed to protect certain important governmental functions and prerogatives from disruption." *Molzof v. United States*, 502 U.S. 301, 311 (1992). Congress was also concerned about "ensuring that certain governmental activities [would] not be disrupted by the threat of damage suits." *Kosak v. U.S.*, 465 U.S. 848, 858 (1984).

### B. Public Health Service Act

"Congress enacted the Public Health Service Act ("PHSA") in 1944 to enable the federal government to meet the country's growing public health needs." *Evans v. United States*, 132 F.4th 473, 477 (7th Cir. 2025). The March 2020 Order was promulgated under

§§ 265 and 268 of the PHSA. Congress located both sections in subchapter II, part G of Title 42 of the U.S. Code, which is titled "Quarantine and Inspection." As is relevant to the parties' arguments, Sections 264 and 271 are also located within Title 42's "Quarantine and Inspection" provisions.[9] An overview of each of these provisions is provided below.

### a. 42 U.S.C. § 264 – Regulations to Control Communicable Diseases

Section 361 of the PHSA, codified at 42 U.S.C. § 264, authorizes the Secretary of HHS, through the CDC,[10] to make and enforce regulations "necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). Additionally, the Secretary has the authority to apprehend and examine "any individual reasonably believed to be infected with a communicable disease in a qualifying stage" who is moving across state lines. 42 U.S.C. § 264(d). If such an individual is found to be infected, the Secretary can detain the individual for such a time, and in such a manner as may be reasonably necessary. 42

---

[9] Subchapter II, Part G, includes the following "Quarantine and Inspection" provisions: (1) Section 264, Regulations to Control Communicable Diseases; (2) Section 265, Suspension of Entries and Imports from Designated Places to Prevent Spread of Communicable Diseases; (3) Section 266, Special Quarantine Powers in Time of War; (4) Section 268, Quarantine Duties of Consular and other Officers; (5) Section 269, Bills of Health; (6) Section 270, Quarantine Regulations Governing Civil Air Navigation and Civil Aircraft; (7) Section 271, Penalties for Violation of Quarantine Laws; and (8) Section 272, Administration of Oaths by Quarantine Officers.

[10] Sections 264 and 265 grant authority to the Surgeon General. However, the Reorganization Plan No. 3 of 1966 abolished the Office of the Surgeon General and transferred the functions of the Surgeon General to the Secretary of Health, Education, and Welfare, which was later redesignated the Secretary of Health and Human Services, and retained the authorities under 42 U.S.C. § 264 and § 265 despite the Office of the Surgeon General being reestablished in 1987. Control of Communicable Diseases, 81 Fed. Reg. 54,230, at 54,232 (Aug. 15, 2016) (codified at 42 C.F.R. pts. 70, 71 (2017)).

U.S.C. § 264(d). Regulations promulgated under § 264 were in existence prior to the COVID-19 pandemic.

>    **b.  42 U.S.C. § 265 – Suspension of Entries and Imports from Designated Places to Prevent Spread of Communicable Diseases**

The March 2020 Order was issued, in part, under the authority of Section 362 of the PHSA. 85 FR 17060-02. Section 362 of the PHSA, codified at 42 U.S.C. § 265 under the heading "Suspension of Entries and Imports from Designated Places to Prevent Spread of Communicable Diseases," provides as follows:

>    Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265. Prior to March 2020, no regulation specifically addressed the CDC's authority to suspend the introduction of classes of persons or property from foreign countries under § 265.[11]

---

[11] In *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), the United States Court of Appeals for the District of Columbia Circuit discussed the history of § 265:

>    In 1893, Congress passed the precursor to [§ 265]. Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452. That year, cholera was overrunning much of the world. *See Cholera Through History*, Britannica, https://www.britannica.com/science/cholera/Cholera-through-history (last visited Feb. 17, 2022). In response, Congress authorized the Executive to determine that individuals from certain countries should be excluded from the United States during public-health emergencies.

### c. 42 U.S.C. § 271 – Penalties for Violation of Quarantine Laws

Section 368 of the PHSA, codified at 42 U.S.C. § 271 under the heading "Penalties for Violation of Quarantine Laws," prescribes penalties for violating:

> any regulation prescribed under sections 264 to 266 of this title, or any provision of section 269 of this title or any regulation prescribed thereunder, or who enters or departs from the limits of any quarantine station, ground, or anchorage in disregard of quarantine rules and regulations or without permission of the quarantine officer in charge[.]

42 U.S.C. § 271(a).

### d. 42 U.S.C. § 268 – Quarantine Duties of Consular and Other Officers

The second authority for the issuance of the March 2020 Order was Section 365 of the PHSA. Section 365 of the PHSA, codified at 42 U.S.C. § 268 under the heading "Quarantine Duties of Consular and Other Officers," provides as follows:

> **(b)** It shall be the duty of the customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations; but no additional compensation, except actual and necessary traveling expenses, shall be allowed any such officer by reason of such services.

42 U.S.C. § 268(b).

---

Despite the cholera pandemic, the Executive did not issue a prohibition under that law until 1929. In response to a meningitis outbreak that year, the Executive declared that the "continued arrival of vessels" carrying meningitis-infected passengers had "overtaxed the combined available quarantine facilities of federal and local health authorities." Exec. Order No. 5143 (June 21, 1929), App. 201. It therefore ordered that "no persons may be introduced directly or indirectly by transshipment or otherwise into the United States" from China or the Philippines "for such period of time as may be deemed necessary." *Id.*

Fifteen years later, the 1893 statute was recodified at 42 U.S.C. § 265, given a new title, and slightly edited.

*Mayorkas*, 27 F.4th at 723.

Consistent with 42 U.S.C. § 268(b), the March 2020 Order tasked DHS and CBP with implementing its directives. 85 FR 17060-02 at 17067. (noting that "because CDC does not have the capability, resources, or personnel needed to [implement the March 2020 Order]" the CDC consulted with DHS and requested that DHS assume responsibility for implementation); *see also id.* ("As part of the consultation [with DHS], CBP developed an operational plan for implementing the order.").

## VI.    DISCUSSION

### A.  Exceptions to Sovereign Immunity – 28 U.S.C. § 2680

The United States' sovereign immunity under the FTCA is limited by several statutory exceptions. *See* 28 U.S.C. § 2680. The United States contends that Plaintiffs' claims are barred by FTCA's exceptions for quarantines, injuries in a foreign country, discretionary functions, the detention of goods, and misrepresentation or deceit. The Court addresses each argument in turn below.

### 1.  Quarantine Exception – 28 U.S.C. § 2680(f)

Under the quarantine exception, the FTCA's sovereign immunity waiver does not apply to "[a]ny claim for damages caused by the imposition or establishment of a quarantine by the United States." 28 U.S.C. § 2680(f). Legislative history indicates that "the quarantine exception was considered as part of a group of exceptions for 'claims which relate to certain governmental activities which should be free from the threat of damage suit.'" *Delgadillo v. United States*, No. CV B-17-59, 2018 WL 5732080, at *11 (S.D. Tex. Sept. 5, 2018), report and recommendation adopted, No. 1:17-CV-00059, 2018 WL

6732888 (S.D. Tex. Nov. 6, 2018), aff'd sub nom. *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445 (5th Cir. 2020) (citing Report of the Joint Committee on the Organization of Congress to Accompany H.R. 181, House. Rep. No. 1287, 79th Cong., 1st Sess. (1945) 6).

The United States contends the March 2020 Order established a foreign quarantine by expelling covered aliens from the United States to various locations abroad with the goal of combating the spread of COVID-19. (Doc. 17, pg. 9). As such, the United States argues, Plaintiffs' claims, which stem from their expulsion under the March 2020 Order, allege harm caused by the implementation of a quarantine and are barred by the FTCA's quarantine exception.

Plaintiffs contend that the word "quarantine" is limited to forced isolations of the sick, not expulsions of asylum seekers. (Doc. 26, pg. 11).[12] They also note that the exception has "predominantly" been applied to livestock, not human beings. (Doc. 26,

---

[12] Plaintiffs contend that, "at the time § 2680 was enacted, 'quarantine' was defined as the 'enforced isolation of a person infected with a contagious disease.'" (Doc. 26, pgs. 10-11). Plaintiffs further contend that "the verb 'to isolate' was defined as 'to keep from usual or normal association or intercourse with.'" (*Id.*). Plaintiffs attach an affidavit purporting to provide the Court with screenshots of these definitions taken from the 1944 edition of *Webster's Complete Reference Dictionary and Encyclopedia.* (Doc. 27, pg. 1). The attached screenshots, however, are taken from *Webster's New International Dictionary of the English Language* (Second Edition) and do not pertain to the referenced definitions. Instead, the screenshots include definitions of words beginning with "cath", such as "cathedral" and "catholic." (Doc. 27, pgs. 3-7). The Court has reviewed the 1944 edition of *Webster's Complete Reference Dictionary and Encyclopedia*, and notes the following definition:

> Quarantine, n. the time (originally 40 days) during which a vessel suspected of carrying infectious disease is prohibited from intercourse with shore; enforced isolation of a person infected with a contagious disease; restraint on the transportation of animals, plants, or goods suspected of bearing disease germs: v.t. to place under quarantine; to isolate; to keep from usual or normal association or intercourse with.

*Webster's Complete Reference Dictionary and Encyclopedia* 425 (The World Publ'g Co. 1944) (defining "quarantine") (attached hereto as Exhibit 3).

pg. 10). Plaintiffs further contend that the legislative history of the PHSA and "clues" in the regulations implementing the PHSA's quarantine and inspection provisions demonstrate that the March 2020 Order cannot be considered the imposition of a "quarantine" under § 2680(f).

The Court begins its analysis by looking to the text of § 2680(f) "to ascertain [the] plain meaning" of "quarantine." *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016). In doing so, the Court looks "to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). The term "quarantine" is not defined in the FTCA. Accordingly, the Court will interpret it "as taking [its] ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014). A word's "ordinary, contemporary, common" meaning is found "by looking at what [the word] meant when the statute was enacted, often by referencing contemporary dictionaries." *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020). "If the statutory language's plain meaning is unambiguous, [the] inquiry ends there." *Id.*

Despite Plaintiffs' arguments to the contrary, contemporary dictionaries confirm that "quarantine" was not narrowly limited to isolating infected persons, nor confined to livestock. For example, Webster's New International Dictionary, Second Edition, Unabridged defined "quarantine" as:

> The term, orig. of forty days, during which a ship arriving in port, and suspected of being infected with a malignant contagious disease, is obliged to forbear all intercourse with the shore; hence, such restraint or inhibition

of intercourse, or the measures taken to enforce it; also, the place where infected or prohibited vessels are stationed. Now, in a wider sense, any forced stoppage of travel, communication, or intercourse, due to contagions or infections or the spreading of plant and animal pests on land or by sea. Quarantine regulation comes under the police powers of a state.

*Webster's New International Dictionary* 2033 (2d ed. 1947) (defining "quarantine") (attached hereto as Exhibit 4).

The same edition of Webster's New International Dictionary also defines "quarantine" as "[a] restraint or interdiction placed upon the transportation of animals, plants, or goods, suspected of being carriers of disease…[or] [t]o compel to remain at a distance, or in a given place, without intercourse, when suspected of having contagious disease…[or] [t]o exclude (one) by quarantine." *Id.*

Funk & Wagnalls New Practical Standard Dictionary defines "quarantine" as "[t]he enforced isolation for a fixed period of persons, ships, or goods arriving from places infected with contagious disease, or of any persons who have been exposed to such infection…[or] [t]he enforced isolation of any person or place infected with contagious disease; loosely, any enforced isolation." *Funk & Wagnalls New Practical Standard Dictionary* 1070 (1954) (attached hereto as Exhibit 5).

Similarly, Bouvier's Law Dictionary (1934), Webster's New Standard Dictionary (1946), and Webster's Complete Reference Dictionary and Encyclopedia (1944) describe quarantine as including the detention or exclusion of ships, goods, or individuals to prevent introduction of disease. *See Bouvier's Law Dictionary* 1007 (1934) (defining "quarantine") (attached hereto as Exhibit 6) (the time "during which the crew of a ship

20

or vessel coming from a port or place infected or supposed to be infected with disease are required to remain on board after their arrival, before they can be permitted to land."); *Webster's New Standard Dictionary of the English Language* 456 (1946) (attached hereto as Exhibit 7) ("days during which a ship suspected to be infected with a contagious disease is obliged to forbear intercourse with the shore"; and to "[p]rohibit from intercourse from fear of infection."); *Webster's Complete Reference Dictionary and Encyclopedia* 425 (1944) (Exhibit 3) (the time "during which a vessel suspected of carrying infectious disease is prohibited from intercourse with shore"; "restraint on the transportation of animals, plants, or goods suspected of bearing disease germs"; or "to keep from usual or normal association or intercourse with."). *See also Bouvier's Law Dictionary* 1007 (1934) (Exhibit 6) (defining the term "quarantine laws") ("Laws the object and the end of which is to provide for the safety of its citizens by preventing, as far as human means can prevent it, the introduction among them of contagious and infectious diseases."); *Id.* (as to quarantines, noting that, by act of congress, "vessels from foreign ports where contagious and other diseases exist, are forbidden to enter the United States" and that "detention and disinfection of immigrants by order of a state board of health, with the purpose of preventing infectious disease, is not a regulation of foreign commerce by a state within the meaning of the constitution.").

These definitions demonstrate two things: First, "quarantine" historically encompassed measures directed at persons, animals, goods, and conveyances, not only

livestock.[13] Second, it was not limited to isolating infected individuals within the United States. Instead, quarantine was understood to encompass a range of measures aimed at preventing the spread of disease, such as excluding, restraining, or detaining persons and goods suspected of carrying contagion. The March 2020 Order fits within that framework. The Order prohibited specified individuals from entering the country and allowed officials to restrain and return those individuals to their point of origin, thereby compelling them to remain outside the United States. These mechanisms mirror the traditional quarantine practices utilized during the relevant period, such as prohibiting a ship from landing and detaining its occupants offshore. The Order's purpose, to prevent the introduction of COVID 19 into the country, is also consistent with the historic goal of quarantine laws, which were directed not only at those already infected, but at preventing a contagion from crossing the borders in the first place.

---

[13] The Seventh Circuit has not addressed whether the quarantine exception applies to humans. Although some district courts have questioned whether the quarantine exception applies to humans, these decisions carry little weight as they merely noted the dearth of case law and declined to resolve the issue. *See Ates v. United States,* No. 2.21-CV-00418-JPH-MG, 2023 WL 1765991 (S.D. Ind. Feb. 2, 2023); *Pressley v. United States,* No. 2:21-CV-00202-JMS-MG, 2023 WL 22192, at *4 (S.D. Ind. Jan. 3, 2023). The Court is not persuaded by Plaintiffs' reference on such cases. (*See* Doc. 26, pgs. 6-7). That "dog that didn't bark" approach, treating silence in the case law as reason to avoid analysis, is not persuasive. In contrast, courts that have analyzed the statute's plain language have concluded that the exception encompasses both humans and animals. *See Thieme v. United States,* No. CV 21-682 (RMB-AMD), 2023 WL 2584102, at *9 (D.N.J. Mar. 21, 2023) (noting that quarantine is defined as "isolation of a person or animal afflicted with a communicable disease or prevention of such a person or animal from coming into a particular area, the purpose being to prevent the spread of disease", and concluding that "the ordinary meaning of quarantine encompasses persons and animals."); *Foreman v. United States,* No. 2:22-CV-10401, 2024 WL 4068775, at *10 (E.D. Mich. July 12, 2024), report and recommendation adopted, No. 22-10401, 2024 WL 4249841 (E.D. Mich. Sept. 20, 2024) (agreeing with the analysis in *Thieme,* concluding "the most reasonable interpretation of the quarantine exception [is that it] does apply to human quarantines").

Thus, giving the statutory text its ordinary meaning, "quarantine" unambiguously includes measures directed at persons for the purpose of preventing the introduction or spread of a potential contagion. This is precisely what the March 2020 Order did. Adopting the Plaintiffs' proffered interpretation, that § 2680(f) restricts "quarantine" to livestock, or to the isolation of individuals within the United States, requires reading language into the statute that is not there. That is something the Court may not do. The Court's job is "to apply, not amend, the work of the People's representatives." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 90 (2017). The Court will not read into § 2680(f) limitations Congress did not include. *See GE Betz, Inc. v. Zee Co., Inc.*, 718 F.3d 615, 624-25 (7th Cir. 2013) ("A court has 'no right, in the guise of construction of an act, to either add words to or eliminate words from the language used by congress.'") (quoting *King v. IRS*, 688 F.2d 488, 491 (7th Cir. 1982)). *See also Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 492 (2006) ("[T]he proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify 'those circumstances which are within the words and reason of the exception'—no less and no more.") (quoting *Kosak v. United States,* 465 U.S. 848, 853 n. 9 (1984)).

Plaintiffs urge the Court to look beyond the plain and ordinary meaning of "quarantine" in § 2680(f), arguing the term's meaning can be found by consulting the PHSA's quarantine and inspection provisions, legislative history, and implementing regulations. The Court questions the propriety of this approach. Although the March 2020 Order was promulgated under the authority of the PHSA, the question before the Court

is whether the United States is entitled to sovereign immunity, and the relevant statute for resolving that question is the FTCA. Looking to the PHSA risks conflating distinct statutes with different purposes; public health management versus the United States' tort liability. As is explained more fully below, there is little justification for concluding that the PHSA has any relevance to deciphering the meaning of terms used in the FTCA.

Congress enacted the FTCA in Title 28, addressing the sovereign immunity of the United States. By contrast, the PHSA is codified in Title 42, governing public health powers.  The two statutes are not part of the same scheme, nor do they cross-reference each other. The Court cannot find, and Plaintiffs do not identify, any basis for concluding that Congress intended the scope of the term "quarantine" in § 2680(f) to be tethered to how the PHSA uses or implements that term. *See Iverson v. United States*, 973 F.3d 843, 850 (8th Cir. 2020) ("statutes [must] be *in pari materia* ('on the same subject') before courts can construe them 'as if they were one law.'") (quoting *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006).

The argument fares no better when framed in terms of regulations implementing the quarantine and inspection provisions of the PHSA. First, some of Plaintiffs' arguments pertain to PHSA regulations implemented after the FTCA and the quarantine exception were enacted. But, "later laws that do not seek to clarify an earlier enacted general term and do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute, are beside the point in reading the first enactment." *Gutierrez v. Ada,* 528 U.S. 250, 257–58 (2000) (internal

quotation marks omitted). If such statutes are typically "beside the point" in reading an earlier enactment, then certainly regulations, promulgated under a separate statutory scheme at a later date, would not be relevant to interpreting the FTCA.

This principle is well illustrated in *Iverson v. United States*, 973 F.3d 843, 850 (8th Cir. 2020). In *Iverson*, the Eighth Circuit rejected the government's argument that transportation security officers ("TSOs") are not "officers" under the FTCA because Congress identified them in a later, unrelated statute, the Aviation and Transportation Security Act of 2001 ("ATSA"), as "employees." *Id.* at 850. The court declined "the invitation to disregard the FTCA's ordinary meaning and instead import Congress's classification of TSOs as employees from the ATSA." *Id.* at 849. In doing so, the Eighth Circuit emphasized that adopting the government's view "would require us to hold that Congress silently altered a term's meaning in one statute by passing an unrelated statute almost 30 years later. Such a holding would be contrary to principles of statutory interpretation." *Id.* at 850. The court also noted that the ATSA and FTCA are not "on the same subject," with the former addressing traveler safety and the latter dealing with federal sovereign immunity and thus should not be construed "as if they were one law." *Id.* (quoting *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006)). *See Leytman v. Transportation Sec. Admin.*, No. 17-CV-4455 (NRM)(MMH), 2025 WL 997528, *7 (E.D.N.Y. Mar. 31, 2025) (whether a TSO is considered a "law enforcement officer" under the ATSA does not control whether a TSO is considered an "investigative or law enforcement officer" under the FTCA).

Second, deference is owed only to an agency exercising delegated authority under the statute at issue. *See Gonzales v. Oregon,* 546 U.S. 243, 258 (2006); *United States v. Mead Corp.*, 553 U.S. 218, 226–27 (2001); *Vulcan Constr. Materials, L.P. v. Fed. Mine Safety & Health Rev. Comm'n,* 700 F.3d 297, 312 (7th Cir. 2012). The CDC has authority under the PHSA, not the FTCA. Nothing in the FTCA delegates to the CDC (or any agency) the power to define its exceptions.

Finally, even if the Court were to rely on the PHSA, its provisions undermine Plaintiffs' arguments, showing that Congress intended § 265 to confer quarantine authority. Although § 265 does not explicitly use the word "quarantine," it is placed within the "Quarantine and Inspection" subchapter of the PHSA, alongside provisions authorizing the CDC to issue regulations to control communicable disease, 42 U.S.C. § 264, apprehend and detain persons, *id.* § 266, and otherwise exercise quarantine powers, *id.* §§ 267-272). That placement indicates Congress viewed the "suspension of entries and imports" (§ 265) as a form of quarantine power, designed to operate alongside the CDC's other statutory tools for preventing the introduction and spread of communicable disease. *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"). Section 271 reinforces this interpretation by expressly designating § 265 as one of the "quarantine laws," thereby confirming that Congress understood the suspension-of-entry power as part of the statutory quarantine scheme. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (the "title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (internal quotations and citations

omitted); *United States v. Fisher*, 6 U.S. 358 386 (1805) ("Where the mind labors to discover the design of the legislature, it seizes every thing from which aid can be derived; and in such case the title claims a degree of notice, and will have its due share of consideration."). Finally, the Court notes that the March 2020 Order was also promulgated, in party, under the authority of § 365, which provides that "[i]t shall be the duty of the customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations…" 42 U.S.C. § 268(b).

The Court is also not persuaded by the Plaintiffs' arguments pertaining to CDC regulations promulgated prior to March 2020. First, Plaintiffs point to the comments accompanying the Interim Final Rule wherein the CDC expressly noted that then-existing regulations allowed the "CDC to quarantine or isolate persons entering the United States," but did not "address the suspension of the introduction of persons entering into the United States under section 362." They contend this distinction shows the CDC itself did not regard § 265 as conferring quarantine authority. Plaintiffs are overreading the commentary. The CDC was merely identifying a regulatory gap, not redefining the statute. As previously discussed, Congress placed §§ 264 and 265 together in the PHSA's "Quarantine and Inspection" subchapter, and in § 271 expressly identified both provisions as "quarantine laws." The absence of regulations implementing § 265 prior to 2020 demonstrates only that the CDC had not yet needed to utilize that authority. And the fact that § 264 uses the word "quarantine," does not mean that Congress intended to exclude § 265 from that category. Rather, the statutory structure indicates that Congress

27

viewed § 265 as conferring a quarantine power, albeit a different type of quarantine power than the power conferred under § 264.

Second, Plaintiffs note that, prior to March 2020, implementing regulations defined "quarantine" as the separation of those "reasonably believed to have been exposed to a quarantinable communicable disease" from others. 42 C.F.R. § 71.1(b). (Doc. 26, pg. 11). Plaintiffs compare this to the interim rule, which provided definitions of various terms, such as "[i]ntroduction into the United States," "but did not define or reference quarantine." (Id.). According to Plaintiffs, this demonstrates the CDC itself distinguishes "quarantine" from measures directed at "suspending" the introduction of persons into the United States. But even if the Court assumes that the CDC's choice of which terms to define demonstrates the agency does not view § 265's suspension of entry authority as a quarantine power, Plaintiffs' argument fails. As previously explained, Congress viewed § 265 as conferring a type of quarantine authority and classified it as a quarantine law. CDC regulations cannot override that classification. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843 (1984). (although regulations may illuminate ambiguities, they cannot override the "unambiguously expressed intent of Congress.").

Finally, Plaintiffs contend that the March 2020 Order cannot be a quarantine measure because it was not accompanied by individualized written orders, as contemplated by 42 C.F.R. § 71.37. This argument requires little discussion. Section 71.37 implements § 264, not § 265. The fact that § 265's implementing regulations did not

include a similar requirement is not dispositive. Nor could the absence of such a provision displace congressional intent with respect to § 265.

To summarize, for the reasons discussed above, the Court finds that the contemporaneous ordinary meaning of "quarantine" as used in § 2680(f) encompasses a broad range of measures aimed at preventing the spread of disease, including the exclusion, restraint, or detention of persons suspected of carrying a contagious disease. The Court further finds that the March 2020 Order, which provided a regulatory mechanism for exercising § 265's quarantine powers, is a type of quarantine under § 2680(f).

This, however, does not end the Court's inquiry. The Court must also assess whether Plaintiffs' alleged harms were "caused by" the "establishment" or "imposition" of a quarantine. As is relevant here, the "imposition" of a quarantine "refers to the manner in which the quarantine is carried out and enforced." *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020). The phrase "caused by" has been interpreted to mean "proximately caused by," the crux of which is "reasonable foreseeability." *Id.* In *Rey v. United States*, 484 F.2d 45 (5th Cir. 1973), a quarantine case involving livestock, the Fifth Circuit explained that the quarantine exception serves as a bar "only to damages proximately resulting from quarantine status[,]" such as "loss in value occasioned by physical restraint on livestock for a period of time or losses caused by the forced exposure of healthy animals to diseased animals within the quarantine area." *Rey* at 48. The exception, however, does not apply to "[d]amages incidental to the

29

quarantine itself," such as "damages caused by the negligent operation of a motor vehicle during the quarantine inspection process." *Id.*

Plaintiffs allege that they were injured when CBP officers wrongfully detained and expelled them from the United States and mishandled paperwork during the expulsion process. Plaintiffs were only detained and expelled because CBP officers were executing the March 2020 Order. Thus, Plaintiffs' damages were not merely an incidental byproduct loosely tied to enforcement of the March 2020 Order. To the contrary, the acts that allegedly harmed Plaintiffs would not have occurred without enforcement of the order. Accordingly, the Court finds that Plaintiffs' claims were caused by implementation of a quarantine, and that the United States is entitled to sovereign immunity with respect to those claims.

In reaching this decision, the Court emphasizes that it is not tasked with determining whether CBP officials correctly enforced the March 2020 Order or whether their conduct was reasonable. FTCA immunity is retained even if the government acted negligently, and even if the government's actions were wrongful or unreasonable. *See Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445 (5th Cir. 2020) (allegations that government's negligent actions during a quarantine caused harm were barred by the quarantine exception); *Rey v. United States* 484 F.2d 45, 48 (5th Cir. 1973) (claim that official "incorrectly imposed" a quarantine and any claims of "negligence in the procedures" by which official arrived at a decision to impose a quarantine were barred by the quarantine exception); *Saxton v. U.S.*, 456 F.2d 1105, 1106 (8th Cir. 1972) ("[A] claim arising out of

*any* 'quarantine' is . . . specifically excepted from the" FTCA) (emphasis added);. *See also Formula One Motors, Ltd. v. U.S.*, 777 F.2d 822, 824 (2d Cir. 1985) (finding "no basis for reading into section 2680(c) a limitation concerning the reasonableness of the [federal official's] conduct" because the § 2680 exemptions serve "to insulate the United States from litigation over precisely such issues").

### 2. Foreign Country Exception – 28 U.S.C. § 2680(k)

The United States contends Counts I (False Imprisonment of Infant A.P.D.M), II (False Imprisonment of A.R.M.R.), IV (Negligence as to both Plaintiffs for Expulsion while Vulnerable), and VII (Intentional Infliction of Emotional Distress as to both Plaintiffs) are barred by the foreign country exception to the FTCA, which excludes claims "arising in a foreign country." 28 U.S.C. § 2680(k).

The United States relies on *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004). In *Sosa,* the plaintiff, a Mexican national, was abducted from Mexico to stand trial in the United States for the torture and murder of a DEA agent in Mexico. After being acquitted, he sued the United States under the FTCA. The Ninth Circuit allowed the claim to proceed under the "headquarters doctrine," which provided that the foreign country exception did not bar suit where negligent acts in the United States proximately caused harm in a foreign country. *Id.* at 701-03. The Supreme Court rejected the headquarters doctrine, holding that "the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred."

In so holding, the Supreme Court observed that the exception reflected Congress's "unwilling[ness] to subject the United States to liabilities depending upon the laws of a foreign power." *Id.* at 707. The Court explained that, when the FTCA was enacted, "the dominant principle in choice-of-law analysis for tort cases was *lex loci delicti*—courts generally applied the law of the place where the injury occurred." *Id.* at 705. The Court ultimately concluded that Congress intended the phrase "arising in," as used in § 2680(k), to carry the same meaning it had in state choice-of-law statutes: namely, that "a claim arises where the harm occurs." *Id.* at 711.

At issue here, is where the Plaintiffs' alleged injuries were "suffered" for the purposes of the foreign country exception. The *Sosa* opinion identifies various formulations of *lex loci delicti*, but it does not provide a definitive answer. *See,* e.g., *Id.* at 705 ("a cause of action sounding in tort arises in the jurisdiction where the last act necessary to establish liability occurred; *i.e.,* the jurisdiction in which injury was received." (quoting John W. Ester, *Borrowing Statutes of Limitation & Conflict of Laws*, 15 U. Fla. L. Rev. 33, 47 (1962))); *id.* 706 (for torts involving bodily harm, the place of wrong is "the place where the harmful force takes effect upon the body"). The Seventh Circuit has not had occasion to address this specific issue, but the Ninth Circuit has concluded that, in deciding where a claim arises under the foreign country question, the relevant question is "where the last act necessary to establish liability occurred." *S.H. by Holt v. United States*, 853 F.3d 1056, 1061 (9th Cir. 2017) (quoting *Sosa*, 542 U.S. at 705). In the absence of controlling Seventh Circuit authority, the Court adopts the Ninth Circuit's test.

32

Counts I and II bring false imprisonment claims on behalf of A.P.D.M. and
A.R.M.R. alleging CBP agents unlawfully confined "A.P.D.M. following her birth and/or
discharge from the hospital and continuing through her physical expulsion from the
United States to Mexico and her extended period of expulsion in Mexico" and deprived
"A.R.M.R. of her liberty by physically expelling her from the United States to Mexico
given that she was medically compromised at the time, had a fear of physical injury,
torture, or death if expelled to Honduras," and did not have COVID-19. (Doc. 1, pgs. 13-
14). Plaintiffs contend CBP agents lacked legal authority to expel A.P.D.M. from the
United States because she was a minor and that her expulsion was carried out against the
will of her mother. (Doc. 1, pg. 13). Plaintiffs further allege that following their expulsion,
they were "confined" to Mexico. Plaintiffs, however, do not allege that any CBP agents
took any action in Mexico that resulted in their confinement. Considering these
allegations, the Court finds that the foreign country exception does not bar Counts I and
II as the last act giving rise to liability was Plaintiffs' expulsion, which occurred in the
United States.

In Count IV, Plaintiffs bring a negligence claim against CBP agents for expelling
them to Mexico under conditions that placed their safety at risk. Plaintiffs allege that CBP
agents "knew or should have known the grave health and safety danger facing Plaintiffs
as a postpartum mother and newborn U.S. citizen infant upon expulsion to Mexico only
days after delivery, without basic necessities or access to them, and without any support."
The crux of Plaintiffs claim is that CBP officials breached their duty of care by expelling

Plaintiffs from the country despite knowing their medical status. As Plaintiffs' frame their claim, the last act necessary to establish liability occurred in the United States, where Plaintiffs were expelled from the Country. Accordingly, Count IV is not barred by the foreign country exception.

Count VII alleges that "[b]y engaging in the acts described in the Complaint, the CBP agents…engaged in extreme and outrageous conduct with an intent to cause, or with a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress." For reasons explained above, the tortious acts alleged in Counts I, II, and IV, arose in the United States. The remaining tortious acts alleged in Counts III, V, and VI (expulsion of A.R.M.R. without seeking a review of fear claims, failure to return belongings prior to expulsion, and failure to provide information about obtaining a birth certificate) also arose in the United States. As such, the foreign country exception does not bar Count VII.

### 3. Discretionary Function Exception – 28 U.S.C. § 2680(a)

The United States argues that A.R.M.R.'s claim in Count II is barred by the FTCA's discretionary function exception. The discretionary function exception precludes:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

34

28 U.S.C. § 2680(a). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals," *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984). It further "prevent[s] judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Loumiet v. United States*, 828 F.3d 935, 941 (D.C. Cir. 2016) (internal quotation marks omitted).

For the exception to apply, the challenged conduct must satisfy two prongs. First, the exception "covers only acts that are discretionary in nature, acts that involve an element of judgment or choice[.]" *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Second, the judgment being exercised must be "of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23. The exception's purpose is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* Thus, the exception "protects only governmental actions and decisions based on considerations of public policy." *Id.*

The United States asserts that the exception bars A.R.M.R.'s claim in Count II, which arises from CBP agents "physically expelling her from the United States to Mexico given that she was medically compromised at the time, had a fear of physical injury,

torture, or death if expelled to Honduras, and had tested negative for COVID-19 and/or did not have COVID-19, in contravention of the [T]itle 42 Order." (Doc. 1 ¶ 68).

Plaintiffs argue the exception does not apply because CBP policy mandated "an individualized assessment of A.R.M.R.'s medical condition before summarily expelling her to Mexico." In support of this argument, Plaintiffs cite to CBP guidance on the treatment of women who give birth in custody. (Doc. 26, at 18–19). This guidance, however, was issued in August 2021, after Plaintiffs' claims arose, and is thus irrelevant to the conduct at issue in this case.

Plaintiffs also invoke the humanitarian exception in the March 2020 Order.[14] But this provision merely permitted agents to allow A.R.M.R. to remain in the country if, "based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests," they deemed it appropriate. 85 Fed. Reg. 17060, 17061 (Mar. 26, 2020). The provision also authorized "case-by-case, individualized exceptions." *Id.* Thus, while CBP agents were *permitted* to allow A.R.M.R. to remain in the country after considering certain factors, they were not *required* to do so. The additional statement that "DHS shall consult with CDC concerning how these types of case-by-case, individualized exceptions shall be made" likewise fails to eliminate discretion. As the Supreme Court has explained, a policy

---

[14] Plaintiffs cite to the CAPIO-1 Memo, but this memorandum did not include a humanitarian exception. They also cite to the CAPIO-2 Memo, but this memorandum was issued after Plaintiffs' claims arose. However, the referenced language establishing a humanitarian exception was included in the March 2020 Order. Accordingly, in analyzing this argument, the Court relies on the humanitarian exception contained in the March 2020 Order.

mandates a specific course of action, and thus defeats the exception, only where it "specifically prescribes a course of action" and leaves the employee "no rightful option but to adhere to that directive." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Here, despite some mandatory language, the challenged conduct involved an "element of judgment or choice"; agents had to weigh relevant policy considerations to determine whether the "totality of the circumstances" warranted a humanitarian exception, and the March 2020 Order did not prescribe *how* that decision must be made. *Id. See also Sabow v. United States,* 93 F.3d 1445, 1453 (9th Cir. 1996) ("[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations."); *Ochran v. United State*s, 117 F.3d 495, 500 (11th Cir. 1997) (holding that the word "shall" in U.S. Attorney General Guidelines did not remove discretion because it failed to specify how to implement the action); *Powers v. United States*, 996 F.2d 1121, 1125 (11th Cir. 1993) (applying the exception where a statute provided that the FEMA director "shall from time to time take such action as may be necessary."). Thus, the humanitarian exception underscores the March 2020 Order's discretionary nature, as it granted agents latitude to balance competing interests without a rigid, enforceable mandate. Additionally, as the Government notes, the CDC consultation language directs DHS to work with the CDC on general procedures for evaluating case-by-case exceptions to expulsion, rather than requiring consultation with the CDC for each individual case.

In summary, A.R.M.R. was detained and expelled under the March 2020 Order and the accompanying CAPIO-1 guidance. The Order's limited exceptions did not apply to her.[15] Although CAPIO-1 provided that "[i]njured aliens" were not amenable to expulsion, neither it nor the March 2020 Order prescribed a specific procedure for identifying an "injured alien." Similarly, neither document included requirements or criteria for evaluating an individual's COVID-19 status.

The Convention Against Torture provision in CAPIO-1 also preserves discretion. Preliminarily, it applied only to aliens asserting such claims about the country of return. A.R.M.R. raised fears about Honduras, but she was expelled to Mexico. More critically, the provision covered only "affirmative spontaneous and reasonably believable claim[s]." (Exhibit 1, CAPIO-1 Memo, pg. 4). The memo offered no guidance on assessing whether a claim was "reasonably believable." Thus, determinations about whether an individual should be expelled, including whether an individual qualified as an "injured alien" or had asserted a credibly exempting fear, inherently involved judgment and choice.

The Court further finds that the subject decisions, whether A.R.M.R. was exempt from the March 2020 Order due to injury, a "reasonably believable" fear claim, or other humanitarian factors, were "based on considerations of public policy." *Berkovitz*, 486 U.S.

---

[15] *I.e.* "U.S. citizens, lawful permanent residents, and their spouses and children; members of the armed forces of the United States, and associated personnel, and their spouses and children; persons from foreign countries who hold valid travel documents and arrive at a POE; or persons from foreign countries in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE." 85 FR 17060, 17061.

at 536. Expelling A.R.M.R. despite her condition implicated humanitarian concerns but permitting her to remain raised countervailing public health risks amid a pandemic. Given that CBP agents had discretion to balance these competing interests, it "must be presumed that [their] acts [were] grounded in policy when exercising that discretion." *Gaubert* 499 U.S. at 324.

### 4. Detention of Goods Exception – 28 U.S.C. § 2680(c)

In Count V, A.R.M.R. brings a claim for negligence, alleging that CBP agents are liable for taking her belongings, including her Honduran-issued identity card, and for failing to return the identity card prior to her expulsion. (See Doc. 1 at ¶ ¶ 50, 87). The United States contends this claim is barred by the "detention of goods" exception. This exception forecloses FTCA claims arising from "the detention of any goods, merchandise, or other property by any officer of customs ... or any other law enforcement officer."[16] 28 U.S.C. § 2680(c), *Kosak v. United States*, 465 U.S. 848, 854 (1984).

In 2000, Congress passed the Civil Asset Forfeiture Reform Act ("CAFRA"), which amended § 2680(c) and created an "exception to the exception." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 221, 239 (2008). This provision "re-waived" the government's immunity by allowing suits for claims arising from the detention of property by law enforcement "if the property was seized for the purpose of forfeiture." 18 U.S.C. § 2680(c)(1); *Ali*, 552 U.S. at 221.

---

[16] There is no dispute the CBP officers in this case are "law enforcement officers" within the meaning of § 2680(c). *See, e.g., Gasho v. United States*, 39 F.3d 1420, 1433; *Ali*, 552 U.S. at 218-222.

CAFRA's re-waiver provision, was created "in response to the overly enthusiastic pursuit of civil and criminal forfeiture." *Diaz v. United States,* 517 F.3d 608, 613 (2d Cir.2008). Thus, the "seizure of property pursuant to a *criminal investigation* was not the problem Congress was seeking to address." (emphasis supplied). *Smoke Shop, LLC v. United States,* 761 F.3d 779, 784 (7th Cir. 2014). Instead, "Congress was predominantly concerned with making property owners whole where the government unsuccessfully brings a forfeiture action and damages or loses the seized property while the action is pending."). *See also Id.* (noting that "the House Judiciary Committee described CAFRA's proposed changes to the FTCA as allowing 'property owners who prevail in forfeiture actions [to] sue the government for any negligent destruction or damage to the property.' ") (citing H.R.Rep. No. 105-358, at 49).

CAFRA's exception applies only when the following four conditions have been met:

> (1) the property was seized for the purpose of forfeiture under any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense;
>
> (2) the interest of the claimant was not forfeited;
>
> (3) the interest of the claimant was not remitted or mitigated (if the property was subject to forfeiture); and
>
> (4) the claimant was not convicted of a crime for which the interest of the claimant in the property was subject to forfeiture under a Federal criminal forfeiture law.

28 U.S.C. § 2680(c).

The Seventh Circuit has held that CARFRA's re-waiver provision applies only to property seized *solely* for the purpose of forfeiture. *Smoke Shop, LLC v. United States,* 761 F.3d 779 (7th Cir. 2014) (adopting the sole-purpose test and the reasoning set forth in *Foster v. United States, 522 F.3d 1071 (9th Cir.2008)*). In *Smoke Shop*, the Drug Enforcement Administration seized smokable "incense products" containing synthetic cannabinoids from a tobacco retailer, asserting they were prohibited under federal drug laws. 761 F.3d at 780. The district court granted the Government's motion to dismiss finding that the government enjoyed sovereign immunity under the detained-goods exception to the FTCA. *Id.*

In affirming the dismissal, the Appellate Court explained that, although the facts alleged in the Complaint were accepted as true, the Complaint did not plausibly allege that the tobacco retailer's claim fell under CAFRA's re-waiver provision. The Court disregarded the allegation that the DEA seized the property for the purpose of forfeiture, explaining that such an allegation "is the type of legal conclusion not entitled to [the] presumption of truth." *Id.* at 785. Next, the Court explained that the facts alleged in the complaint gave rise to "an obvious alternative explanation" for the seizure:

> that the DEA seized Smoke Shop's inventory in connection with its investigation of a possible drug crime. DEA agents raided the store with local law enforcement officers in tow. The agents did not have a search warrant, but they didn't need one, as [the owner] consented to the search and seizure of his inventory. All along, the DEA maintained that it was

41

> testing the products to see if they contained an illegal substance under federal drug laws. And sure enough, tests revealed that the products did contain substances that the government considered illegal under the Controlled Substances Analogue Act.

(*Id.* at 785).

The reasoning in *Smoke Shop*, controls here. As in *Smoke Shop*, Plaintiffs' allegations do not bring this claim within CAFRA's narrow "re-waiver" of sovereign immunity. The Complaint does not plausibly allege that A.R.M.R.'s property was seized for the purpose of forfeiture. Additionally, the facts alleged provide an "obvious alternative explanation" for the seizure which precludes application of CAFRA's forfeiture exception.

First, CAFRA's limited waiver applies only when the property "was seized for the purpose of forfeiture under any provision of Federal law." 28 U.S.C. § 2680(c)(1). Merely alleging that property was taken and not returned does not satisfy that requirement. A failure to return property does not transform a seizure into one "for the purpose of forfeiture," nor does it establish that any forfeiture proceeding under a federal statute was ever contemplated or initiated.

Second, Plaintiffs cannot avoid dismissal by asserting in their response that the property "was seized for the purpose of forfeiture." The Complaint itself contains no such allegation, and a plaintiff "may not amend the complaint by briefs in opposition to a motion to dismiss." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989). In any event, a statement that the property was seized "for the purpose of forfeiture" is precisely the type of legal conclusion that the court in *Smoke Shop* held is "not entitled to [a] presumption of truth." 761 F.3d at 785.

Third, even if the Complaint had included such an allegation, dismissal would still be warranted. Under the Smoke Shop "sole purpose" test, the plaintiff must plausibly allege that forfeiture under a federal statute was the exclusive purpose of the seizure. It is not enough that forfeiture was a possibility, that it was later considered, or even that it might have been one of several objectives. *Id.* at 784 (adopting *Foster v. United States*, 522 F.3d 1071, 1079 (9th Cir. 2008)). Allowing CAFRA's waiver to apply whenever an officer merely "envisioned the possibility" of forfeiture would "eviscerate the FTCA's detained-goods exception in the context of criminal investigations," because forfeiture is nearly always a foreseeable outcome. *Id.*

Finally, and most importantly, the Complaint alleges facts that identify an obvious alternative explanation for the seizure. Plaintiffs allege that A.R.M.R.'s belongings were seized when she was detained and expelled pursuant to the March 2020 Order governing the expulsion of noncitizens who entered the United States unlawfully. Thus, as alleged in the Complaint, the seizure of A.R.M.R.'s belongings occurred in connection with CBP's enforcement of the March 2020 Order. More specifically, the subject property was seized in connection with CBP's investigation as to whether A.R.M.R. had entered the country lawfully and, if applicable, to effectuate her expulsion under the March 2020 Order. That investigative and administrative purpose defeats any plausible inference that the property was seized *solely* for the purpose of forfeiture.

In short, as in *Smoke Shop*, the allegations of the Complaint foreclose the application of CAFRA's "forfeiture" exception to the FTCA's detention-of-goods bar.

Because the Complaint does not (and cannot) allege that A.R.M.R.'s property was seized
*solely* for the purpose of forfeiture under a federal statute, her negligence claim (Count V)
is barred by 28 U.S.C. § 2680(c).

### 5. Misrepresentation Exception – 28 U.S.C. § 2680(h)

The United States contends that Plaintiffs' claim in Count VI (negligence claim
alleging failure to provide Plaintiffs with information about obtaining a U.S. birth
certificate) is barred by the misrepresentation or deceit exception found in 28 U.S.C. §
2680(h). Additionally, the Government contends this exception bars claims brought on
A.P.D.M.'s behalf in Counts I (false imprisonment), IV (negligence claim alleging
expulsion to a location or in a condition placing A.P.D.M. at risk), and VII (intentional
infliction of emotional distress).

The FTCA's waiver of sovereign immunity does not extend to "[a]ny claim arising
out of ... misrepresentation [or] deceit." 28 U.S.C. § 2680(h).   The exception bars both
negligent and intentional misrepresentations, as well as affirmative acts and omissions of
material fact. *Nixon v. United States*, 916 F. Supp. 2d 855, 859 (N.D. Ill. 2013) (citing
*Metropolitan Life Ins. Co. v. Atkins,* 225 F.3d 510, 512 (5th Cir. 2000). To determine whether
a claim falls under the misrepresentation exception, courts "must 'look to the essential act
that spawned the damages,' not to 'the manner in which a plaintiff chooses to plead her
claim[.]'" *Id.* (quoting *Metro. Life Ins. Co. v. Atkins*, 225 F.3d 510, 512 (5th Cir. 2000)).

Additionally, courts must examine whether the injuries resulted from the
communication of information or the performance of operational tasks. *See Redmond v.*

*United States,* 518 F.2d 811, 816 (7th Cir.1975); *Mundy v. United States,* 983 F.2d 950, 952 (9th Cir. 1993). "Where the gravamen of the complaint is the negligent performance of operational tasks, rather than misrepresentation, the government may not rely upon § 2680(h) to absolve itself of liability." *Redmond,* 518 F.2d at 816 quoting *Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227, 239 (2d Cir.1967). Finally, where "the government's misstatements are not essential to [the claim]," the exception does not apply. *Block v. Neal,* 460 U.S. 289, 297 (1961). *See also* Schneider v. *United States,* 936 F.2d 956, 961 (7th Cir. 1992).

As a preliminary matter, the Court rejects Plaintiffs' contention that the exception is limited to "claims based on the duty to use care to communicate information to prevent economic loss." (Doc. 26, pg. 22). Though the Seventh Circuit does not appear to have directly addressed the issue, other circuits have rejected such a contention. For example, in *Kim v. United States,* 940 F.3d 484 (9th Cir. 2019), the Ninth Circuit Court of Appeals rejected the argument that the exception was limited to those "seeking to recover for economic loss suffered as a result of a commercial decision" *Id.* at 492. In so holding, the Ninth Circuit explained that, although some courts have observed the exception has traditionally been applied to financial or commercial misrepresentations, *see* e.g., *Block v. Neal,* 460 U.S. 289, 296 n.5 (1983), "such cases do not hold that the exception *cannot* apply in other contexts." *Id. See also* see also *Reynolds v. United States,* 643 F.2d 707, 712 (10th Cir. 1981) ("[t]he 'misrepresentation' exception of 28 U.S.C. s 2680(h) has been broadly construed to include false representations of any type."). Moreover, on at least one occasion, the Seventh Circuit has – in an unpublished opinion – affirmed dismissal of a

45

non-economic claim based on the misrepresentation exception. *See Omegbu v. United States*, 475 F. App'x 628 (7th Cir. 2012) (claim that officials "deliberately falsified information" in plaintiff's immigration file, resulting in denial of his naturalization application, was "precisely the kind barred by the FTCA's exception for misrepresentation and deceit.").

Next, Plaintiffs contend that the exception is inapplicable because Plaintiffs' claims arise from "CMP's negligent performance of its operational tasks" regarding the provision of information for obtaining U.S. birth records. (Doc. 26 ¶¶ 21-22). To support this argument, Plaintiffs cite to a CBP policy statement. (*Id*) (citing *Children Born in CBP Custody*, Doc. 1 ¶ 28 N. 21-23). But the policy lists an "effective date" of May 24, 2022. Even assuming the policy has the impact Plaintiffs allege, it cannot apply to claims that arose approximately two years earlier. Having resolved these preliminary arguments, the Court turns to the specific counts.

The Court finds that Count VI is barred by the misrepresentation exception. In this count, Plaintiffs allege negligence based on CBP agents' failure to provide A.R.M.R. with information on how to obtain a birth certificate for A.P.D.M., including underlying false statements that A.R.M.R. could not register A.P.D.M.'s citizenship at that time, that A.P.D.M. could not return to the United States until A.P.D.M. was 18, and that only A.P.D.M. could register her own citizenship. Plaintiffs allege the agents knew or should have known that these statements were false. Here, the essential act causing the alleged damages is the communication of false information and the omission of accurate material

46

facts regarding citizenship and birth certificate procedures. The claim arises out of negligent or intentional misrepresentation because the alleged harm flows directly from officials providing false information essential to navigating A.P.D.M.'s status as a citizen of the United States. As such, it is barred by the exception.

By contrast, the Court finds that Plaintiffs' claims in Counts I, IV, and VII are not barred by the misrepresentation exception. In Count I, alleging false imprisonment of A.P.D.M., the essential act is the CBP agents' unlawful physical confinement and expulsion of a U.S. citizen without authority or consent. This wrong occurred independently of any communicative failures; the allegedly false statements are incidental and not essential to the harm, which would exist regardless of reliance on those misrepresentations. Count IV's negligence claim centers on the execution of the expulsion in a manner that risked Plaintiffs' health and safety, with any misstatements being merely collateral. Count VII, for intentional infliction of emotional distress, encompasses the totality of the agents' acts in confinement and expulsion, causing severe emotional distress independent of any alleged misrepresentations. As such, Counts I, IV, and VII survive the exception.

## B. Failure to State a Claim

The Government presents three additional grounds for dismissal: (1) The Complaint fails to state a claim under Texas law for false imprisonment (Counts I and II); the Complaint fails to state a claim for failure to refer A.R.M.R. to USCIS for a fear of persecution or torture screening (Count III); and (3) Counts II and III, which allege

violations of federal law, must be dismissed because there is no private person analogue for the alleged violations.

Given the Court's finding that each of Plaintiffs' claims is barred by one or more of the exceptions to the waiver of sovereign immunity outlined in 28 U.S.C. § 2680, the Court need not address the Government's remaining arguments.

### VII.   CONCLUSION

Based on the analysis set forth herein, the Court finds that Counts I through VII are barred by the quarantine exception to the Federal Tort Claims Act; Count II is barred by the discretionary function exception to the Federal Tort Claims Act; Count V is barred by the detention of goods exception to the Federal Tort Claims Act; and Count VI is barred by the misrepresentation or deceit exception to the Federal Tort Claims Act. Therefore, the Court **GRANTS** the United States' Motion to Dismiss pursuant to Rule 12(b)(6) for failure to state a claim. Because all of Plaintiffs' claims arise out of conduct that is exempted from redress under the Federal Tort Claims Act and amendment would be futile, the Complaint is dismissed with prejudice. The Court **DIRECTS** the Clerk to close the case and to enter judgment accordingly.

**IT IS SO ORDERED.**

**Dated**: December 3, 2025

_____
**DAVID W. DUGAN**
**United States District Judge**

48